(No. 46479.- )

JOHNS-MANVILLE CORPORATION, Appellant, v. THE
INDUSTRIAL COMMISSION et al.—(John Hartman,
Appellee.)

*Opinion filed March 24, 1975.*

Fuqua, Fuqua, Winter & Homer, of Waukegan (Ellis E. Fuqua, of counsel), for appellant.

Raymond L. Lannon, of Chicago (Sidney Z. Karasik and Gary E. Dienstag, of counsel), for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

The arbitrator made an award to John Hartman for total permanent disability. The Industrial Commission confirmed the award and the circuit court of Lake County confirmed the Industrial Commission. The employer, Johns-Manville Corporation, appealed directly to this court. Ill. Rev. Stat. 1973, ch. 110A, par. 302(a).

John Hartman, the employee, was 47 years old in 1970. He had been employed by the Johns-Manville Corporation for 14 years. Until 1963 his duties involved checking and recording the number of pieces of material produced by other employees and various machines. In

1963 he was given a job drilling holes in blocks of material, a job which he performed until the occurrence in question on June 10, 1970.

On that date Hartman started working at 7 a.m. His job that morning was to drill four holes in each block. About 400 blocks were on a metal wheeled cart. He pushed the loaded cart from 10 to 20 feet into place beside his machine. To perform the drilling operation he had to depress a foot pedal to bore each hole. To complete the drilling of four holes in each of the 400 blocks on the cart he had to raise and lower his foot 1600 times. He also had to remove each block from the loaded cart, position it in the jig, and manually place the block and jig in the machine. The block and jig together weighed 18 to 20 lbs. After the holes were drilled, he placed each block on another cart. He finished the first cart of 400 blocks in about two hours. He then pushed the loaded cart some 12 feet to the next station and then got another cart loaded with 400 blocks and pushed it to his machine. Each loaded cart weighed approximately 1,000 lbs. He started drilling the four holes in each block from the second load. The temperature in the area where he was working was from 90 to 95 degrees and he was perspiring freely.

While Hartman was drilling the second load of blocks he felt his heart "start to beat a little faster." After about an hour of this sensation he went to the medical department. He was examined there by Dr. Davidson, who sent him to Dr. Nellins's office, where an electrocardiogram was taken and he was admitted to a hospital. While there he was given medication; he was discharged in 10 days, but he did not return to work until September 12, 1970—three months after the attack. When he returned to work, he was given a different job; however, he only worked for about three weeks, during which time he noticed that he was very weak and that he occasionally had difficulty in breathing. He was again admitted to the hospital on October 19, 1970, and on November 17 he was

admitted to another hospital, where open heart surgery was performed during which two defective valves in his heart were replaced with artificial devices. He was discharged from the hospital on December 11, 1970. He has not been employed since October 16, 1970.

He is still under the care of Dr. Nellins and is taking medication. At the present time, he "weakens very fast" and has trouble breathing when he walks up a hill. He is only able to walk about a half mile, and he is able to do light work such as raking in his yard, but only for about 20 minutes at a time.

The evidence shows that when Hartman was about 12 years old he had what was then thought to be scarlet fever; however, the medical testimony in the case shows that the doctors who testified believe that it was rheumatic fever and that as a result of this illness Hartman has a rheumatic heart. When he was 19 years old, he was rejected for military service because he had a heart murmur. When he began work for Johns-Manville Corporation in 1956, he was given a physical examination and was again informed that he had a heart murmur. He has had annual physical examinations in connection with his work thereafter. He recalls that following these examinations doctors would inform him of the heart murmur. He missed very little time from work because of illness during the 14 years that he worked for this employer. However, in March of 1970 he was admitted to a hospital as an emergency patient. The diagnosis upon admission was "mitral insufficiency in mild left heart failure" and acute pulmonary infection. He remained in the hospital for three days and was off work about 10 days. About four days before June 10, 1970, he had an episode of tachycardia (excessively rapid action of the heart) which subsided spontaneously after about three days.

It is the employer's first contention that on June 10, 1970, Hartman was performing his usual duties and did nothing unusual which could have related the episode to

his work. The employer contends that Hartman's disability is the result of the natural progression of a gradually debilitating disease (rheumatic heart disease). The employer also contends that the disability was not caused by an accident within the meaning of the Workmen's Compensation Act.

The reliance upon *International Harvester Co. v. Industrial Com.*, 56 Ill.2d 84, is misplaced. Here, unlike in *International Harvester Co.*, the onset of Hartman's disability of which he now complains is traceable to a definite time and place. If the evidence supports the conclusion of the Industrial Commission that the cause is also traceable to his employment on the date in question, he has suffered an accidental injury within the meaning of the Act. We held in *International Harvester Co.* that an injury is accidental within the meaning of the Act which is traceable to a definite time, place and cause and occurs in the course of employment unexpectedly and without affirmative act or design of the employee.

The resolution of this case then turns on whether some aspect of Hartman's employment caused the episode of June 10, 1970, and his resulting disability. This court was faced with a similar question in *Republic Steel Corp. v. Industrial Com.*, 26 Ill.2d 32, which case also involved an employee with a pre-existing heart condition. This court held, as we later held in *International Harvester Co.*, that there need be neither external violence nor unusual strain or exertion in performing the regular duties of employment. The question is whether the unforeseen giving way of a part of the employee's body would be deemed to be *caused* or *precipitated* by his work. In *Republic Steel* this court, in reviewing other heart cases, concluded that in cases of pre-existing heart disease recovery is not necessarily precluded, depending on whether the disability was the combined result of the disease and the employee's work or the result of the disease alone.

Thus, in our case, Hartman had the burden of establishing that his employment on June 10, 1970, was a causative factor of the heart episode that occurred on that date and precipitated his disability. "He need not prove it was the sole causative factor nor even that it was the principal causative factor, but only that it was *a* causative factor in the resulting injury." (*Republic Steel Corp. v. Industrial Com.*, 26 Ill.2d 32, 45; see also *Kerz v. Industrial Com.*, 51 Ill.2d 319, 322; *Smallwood v. Industrial Com.*, 53 Ill.2d 151, 155.) This court considered the nature of the required proof as to a causative factor in cases such as Hartman's in *City of Chicago v. Industrial Com.*, 45 Ill.2d 350, and stated at page 352: "However, if one's heart has deteriorated to such an extent that any exertion becomes an over-exertion, it is not sufficient to merely show that the employee has engaged in some job-connected physical activity prior to his attack. [Citation.] The burden was on the claimant to show that certain activites incidental to employment were performed by the employee, that these activities were of a character to expose the employee to a greater risk of injury than if he had not been so employed, and that there was a causal connection between the activities and the death of the employee." See also *Pontiac Chair Co. v. Industrial Com.*, 59 Ill.2d 261, 266.

Dr. Fitzsimmons, a general practitioner, testified for the employee. He had examined Hartman on May 18, 1972, and an electrocardiogram was taken. He testified as to the results of his examination, and in response to a hypothetical question concerning Hartman's prior physical condition, the nature of his work and the work he performed on June 10, 1970, stated that in his opinion there could be a causal connection between the employment on that date and Hartman's disability and that the present condition is permanent. On cross-examination he stated that what he had interpreted as an infarct from the electrocardiogram taken by him on May, 1972, may have

been a showing of the operative procedure and scarring resulting from the heart surgery of November, 1970. He also stated on cross-examination that a person with a rheumatic heart disease within a period of a few months before required surgery would probably experience some cardiac problems which could occur while he was at home or even while lying in a hospital bed. However, he stated it would be more likely to occur with exercise or stress. The employer suggests that in light of Dr. Fitzsimmons's statements on cross-examination his opinion as to causal connection carries little weight.

The employer called Dr. Nellins as a witness before the arbitrator. Dr. Nellins is certified as a specialist in internal medicine. He had treated Hartman following the June 10, 1970, incident and during his hospitalization. He continued to treat him after his discharge from the hospital and again hospitalized him on October 19, 1970. On November 7, 1970, he had him transferred to another hospital for further examination and possible surgical correction. The surgical procedure was performed, and after Hartman's discharge from the hospital Dr. Nellins continued to treat him. In response to a hypothetical question, Dr. Nellins testified that there was no causal relationship between Hartman's work and his condition. He based his opinion on the fact that Hartman was performing his usual work. He stated that if a heart episode occurs under such circumstances "It would have occurred at any time anyway." The doctor concluded that if Hartman would have been performing excessive physical exertion, there could have been a causal relationship.

On cross-examination Dr. Nellins stated that increased activity or exercise increases the circulation and also increases the operation of the heart. He stated that the extra energy required to push a 1,000 lb. cart-load of blocks would increase the beat of the heart and in turn would cause an increase in the operation of the defective heart valves.

On review before the Industrial Commission the employer called Dr. Clark as a witness. He had examined Hartman and had recommended the open-heart surgery which was performed in November, 1970. As a result of his examination, he made a diagnosis of rheumatic heart disease with an aortic insufficiency and mitral insufficiency. He had found severe leakage of the mitral valve as well as the aortic valve. He stated that there was no causal connection between Hartman's work and the condition which he found. His opinion was based on the fact that Hartman had rheumatic heart disease which was not related to his working condition.

On cross-examination Dr. Clark stated the rheumatic process will continue regardless of whether the patient is in bed or is active. However, if a man exerts himself unduly there may be symptoms brought on a little earlier. He also stated that the use of the foot pedal by Hartman 1600 times in the first two hours of work on June 10, 1970, would probably have elevated his blood pressure and would have made the defective valves work faster. This would bring about more regurgitation of the blood through the defective valves. He also stated that a 1000-lb. load would be a lot of weight for a man with Hartman's heart condition to push. He thought that it was probable that the stress of Hartman's work and his rheumatic heart disease could make a pre-existing cardiac problem worse. On further questioning he admitted that Hartman's work could have hastened his congestive heart failure, but he was not able to say by how much because he did not know.

Relying on the testimony of Dr. Nellins and Dr. Clark the employer contends that the finding of the Industrial Commission is against the manifest weight of the evidence. We do not agree. It is axiomatic that the determination of factual questions, including the resolution of conflicting medical testimony relating to causal connection, is primarily within the purview of the Industrial Commission.

(*Pontiac Chair Co. v. Industrial Com.*, 59 Ill.2d 261.) It is likewise within the purview of the Commission to draw permissible inferences and to decide which of conflicting medical views is to be accepted. *Ford Motor Co. v. Industrial Com.*, 50 Ill.2d 267.

Dr. Fitzsimmons, testifying for Hartman, stated that in his opinion there was a causal connection. Whether this testimony is entitled to any weight or whether it was impaired through cross-examination must be determined by the Industrial Commission. Although Dr. Nellins and Dr. Clark testified that there was no causal connection, on cross-examination their opinions on this question appear less positive and in fact may support the inference that the stress of Hartman's normal work may have been sufficient to aggravate his pre-existing condition and to precipitate his disability. The inferences to be drawn from their statements on cross-examination and the weight to be given to their opinions expressed on direct examination are again for the Industrial Commission's determination.

This court recently stated in *Ford Motor Co. v. Industrial Com.*, 50 Ill.2d 267, 272: "There was sufficient evidence in the record to support the Commission's conclusion that the disability in this case was not the result of disease alone, and to support its findings that [claimant] did sustain an accidental injury which arose out of and in the course of his employment and resulted in his total and permanent disability." This language is applicable to the case now under consideration.

The judgment of the circuit court of Lake County is affirmed.

*Judgment affirmed.*