JOHN DEERE PLOW AND PLANTER WORKS OF DEERE AND COM-
PANY, Appellee, v. INDUSTRIAL COMMISSION *et al.* (Kenneth L.
Huntley, Appellant).

Third District (Industrial Commission Division)   No. 3—87—0163WC

Opinion filed May 4, 1988.

Allan Hartsock, of Winstein, Kavensky, Wallace & Doughty, of Rock Is-
land, for appellant.

Hubbard B. Neighbour, of Bozeman, Neighbour, Patton & Noe, of Moline, for appellee.

JUSTICE CALVO delivered the opinion of the court:

Claimant, Kenneth L. Huntley, filed an application for adjustment of claim under the Workers' Occupational Diseases Act (Ill. Rev. Stat. 1979, ch. 48, par. 172.36 *et seq.*), alleging that his hearing loss arose out of and during the course of his employment with the John Deere Company. After·hearing evidence, the arbitrator awarded claimant $269.21 per week for 102 weeks, representing a hearing loss of 39% to the left ear and 63% to the right ear. (Ill. Rev. Stat. 1979, ch. 48, par. 172.42.) The Industrial Commission affirmed the decision of the arbitrator but was reversed by the circuit court, which found that the award was contrary to the manifest weight of the evidence. Claimant appeals. The facts are as follows.

On June 15, 1982, the 43-year-old claimant testified that between the years 1955 and 1964 he was a member of the Illinois National Guard. During each summer, he spent two weeks firing a 40 millimeter antiaircraft gun and a 105 millimeter Howitzer. Although both guns were extremely noisy, ear protection was provided only for those firing the 105 millimeter Howitzer. Claimant also related that he had been a competitive rifle shooter for several years prior to when he quit shooting in 1968. Since this activity was extremely noisy, claimant wore ear protection while engaging in it.

On cross-examination, the employer admitted into evidence a survey claimant had filled out in February 1982. In this survey claimant answered "yes" when asked if he practiced with guns on a regular basis. Claimant further answered that he practiced on an indoor range once per week. When asked about this survey, claimant reaffirmed that he had not shot a weapon since 1968 and stated that his answers to these questions were based on his prior shooting experience. The employer also admitted into evidence a memo dated December 15, 1977, from Wayne Johnson, a member of the employer's safety department. This memo stated that claimant told Johnson that he was using the same Lesonic earplugs at work that he used when shooting high-powered rifles. Johnson stated that claimant indicated he was currently involved in shooting high-powered rifles. When asked about this memo, claimant denied using Lesonic earplugs at work. Claimant also stated that he thought Johnson was asking him what brand of earplugs claimant used while engaged in shooting, not whether he still used such earplugs or shot a weapon.

After graduating high school in 1957, claimant worked as a ma-

chine operator at International Harvester for 10 years, during which time he also moonlighted as a maintenance welder for a construction firm. After leaving Harvester, claimant worked about 2½ years as a tool-and-die welder for an engineering firm. The welding claimant performed for the engineering and construction firms was stick arc welding.

In 1969 claimant went to work for the employer in the industrial equipment division as a stick arc welder. After working at this job for about a year, claimant was laid off for a year. Claimant subsequently returned to work for the employer in the Plow and Planter Works as a mig welder.

The mig welding claimant performed consisted of using a machine to weld seed hopper support brackets. This is accomplished by placing the machine at the bottom of the fiberglass seed hopper where the support brackets are located. The welder observes the welding operation by looking down inside the seed hopper. The building where the welding is performed is an open room with concrete walls and a 10- to 12-foot concrete ceiling. Nine welders work in this room, separated by translucent curtains. Each welder has a 24-inch exhaust fan for ventilation. In approximately 1978, the employer replaced windows along one wall which had been kept open prior to this time. The new windows do not open.

According to claimant, the noise created by a mig welding operation is much more intense than that created by stick arc welding. Moreover, since the loud, high-pitched noise of the welding machine reverberates inside the seed hopper into which the welder peers to observe the welding operation, the noise seems much more intense while welding. Claimant related that even when he was not welding, the noise from the other welders and the exhaust fans were loud enough to make it necessary to talk loudly while standing close to one another. Claimant believed that the noise level had noticeably worsened after the old windows were replaced.

Claimant was first examined for a hearing problem on January 21, 1977, by Dr. Robert Lelonek, an otolaryngologist. At this time, claimant related that he had experienced hearing loss in his right ear for approximately six months prior to examination. The X rays, tomograms and examination conducted at this time noted no physical abnormalities. An audiogram showed "bilateral neurosensory hearing loss with [claimant's] discrimination being somewhat poorer on the right side. Hearing loss in the right ear was measured at 27% with the left ear showing normal." Tests for tone decay of the right ear were negative. After the examination, Dr. Lelonek told claimant to

wear as much hearing protection as possible. Dr. Lelonek also told claimant that he should be rechecked annually or if he noticed further hearing loss. Pursuant to Dr. Lelonek's advice, claimant obtained hearing protection from the employer which he has used ever since.

On June 16, 1980, a repeat audiogram revealed a hearing loss of 59% in the right ear and 30% in the left ear. On October 28, 1980, an audiogram showed 63% hearing loss in the right ear and 36% in the left ear. A September 29, 1981, audiogram showed 63% hearing loss in the right ear and 39% in the left ear. The record shows that the results of hearing tests administered by the employer were similar. On September 14, 1981, claimant was examined by the employer's physician, who found "sensorineural hearing loss due to noise exposure." After several examinations and tests failed to establish a physical cause for the hearing loss, Dr. Lelonek concluded that the hearing loss was caused by exposure to excessive noise.

On August 11, 1977, the employer performed a decibel level test near claimant's welder. Although there is some dispute as to how this test was conducted, the test results showed the average decibel level during an eight-hour shift to be 82. From June 11 to June 17, 1980, the Federal Occupational Safety and Health Administration found decibel level violations (*i.e.*, average decibel reading in excess of 90 during an eight-hour shift) in the building where claimant worked. Tests conducted by the employer around this time showed that the average noise level on welders located in the building where claimant worked was frequently in excess of 90 decibels.

■ Industrial Commission Rule 13—1(a) states that exposure to workplace noise with an intensity of 90 decibels or more for eight hours or its time-weighted equivalent creates a rebuttable presumption of employment-related hearing loss. There is no doubt that around June 1980 the claimant was exposed to noise levels in excess of 90 decibels for eight hours or its time-weighted equivalent. However, since claimant began wearing ear protection after Dr. Lelonek's first examination on January 21, 1977, the question before this court is whether the Industrial Commission could have found that such ear protection did not prevent claimant from being exposed to the excessive noise levels.

■ In *United States Steel Corp. v. Industrial Comm'n* (1985), 132 Ill. App. 3d 101, 477 N.E.2d 237, this court upheld an Industrial Commission award of benefits for a hearing loss through the date when the employer furnished ear protection. In doing so, we adhered to the well-established axiom that the factual findings of the Industrial Commission will not be disturbed on review unless they are con-

trary to the manifest weight of the evidence. (132 Ill. App. 3d at 105, 477 N.E.2d at 240.) In its decision on review, the circuit court quoted the following language from *United States Steel* in support of its finding that the Industrial Commission's award of benefits in the instant case was contrary to the manifest weight of the evidence:

"[W]e think that the [Industrial Commission] reasonably could have inferred that respondent would not have given claimant the earmuffs and ear plugs if they did not serve the purpose intended, that is, to eliminate excessive noise ***." 132 Ill. App. 3d at 106, 477 N.E.2d at 240.

■ The circuit court has misapprehended our holding in *United States Steel*. First, in *United States Steel* we were affirming rather than reversing an Industrial Commission factual determination. Second, the above quote and the surrounding language clearly indicate that it is the province of the Industrial Commission to infer whether or not the presence of ear protection had an effect upon claimant's subsequent loss of hearing. Third and most importantly, the effect of the circuit court's ruling, *i.e.*, that the date when ear protection is furnished is always the date of last exposure to excessive noise levels, cannot be reconciled with the possibility that the furnished ear protection may be inadequate. Accordingly, the basis for the trial court's ruling is rejected. We will now determine if the Industrial Commission could properly find that claimant was exposed to excessive noise levels at work.

■ The evidence showed that between 1977 and 1981 claimant experienced a considerable hearing loss even though he was wearing ear protection. Although the employer obtained an 82 decibel reading in claimant's workplace in 1977, the readings obtained by Federal OSHA in June 1980 were in excess of 90 decibels. This documented increase in workplace noise is consistent with claimant's assertion that the noise level became worse after new windows were installed in 1978. On the basis of this evidence, the Industrial Commission could have inferred that the ear protection afforded claimant was not effective against the additional noise which manifested itself after 1977. The judgment of the circuit court must therefore be reversed, with the Industrial Commission's award of compensation reinstated.

Reversed and award reinstated.

BARRY, P.J., and McCULLOUGH, McNAMARA, and WOOD-WARD, JJ., concur.