WAGNER CASTINGS COMPANY, Appellee, v. THE INDUSTRIAL COM-
MISSION *et al.* (Norbert Pierceall, Appellant).

Fourth District (Industrial Commission Division)   No. 4—92—0065WC

Opinion filed February 25, 1993.

Baird, McCarthy & Rowden, of Decatur (D. Douglas McCarthy, of counsel), for appellant.

Samuels, Miller, Schroeder, Jackson & Sly, of Decatur (Mark E. Jackson, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

The claimant, Norbert Pierceall, appeals from an order of the circuit court of Macon County, reversing an award of benefits to him by the Illinois Industrial Commission (Commission) and against the employer, Wagner Castings Company. The issue on appeal is whether the decision of the Commission is against the manifest weight of the evidence.

At the arbitration hearing, claimant testified that he was 59 years of age and had worked for the employer from February 1964 until October 1, 1985. His last day at work was September 10, 1985. Initially, he worked as a laborer in the malleable foundry area. He described the noise in that area as constant from the molding machines and the vibrators on the hoppers. He did not wear any ear protection. In June 1964, he began working as a millwright in the maintenance department in the malleable foundry. His job consisted of maintaining, repairing and constructing all plant equipment and required him to work in all areas of the plant. Except for nine months in 1977 when he worked as a grinder in the ductile foundry, he stayed in the malleable foundry until 1980 when he was transferred to the ductile foundry. Claimant also hunted on a seasonal basis.

Claimant testified that during the period of time he was assigned to the malleable foundry he worked near an area called the "sprew chute" or "sprew balcony." That area was located at the center of the malleable foundry. Workers would break the sprews from the castings with hammers, and the sprews would be thrown down chutes into hoppers and would then periodically be picked up to run through the system again. Claimant would work in the area where the hammers were used whenever the machinery broke down; he would be anywhere from 5 to 25 feet away from the hammers. Many times he was only five feet away. He described the noise level as a very loud din, consisting of the sounds of six hammers continually hammering on metal, two 300-horsepower motors and cleaning machinery. Depending on what needed repair, he could be in the area anywhere from a few minutes to four or five hours at a time. Between 1964 and 1980, there were times when he spent as much as a day or more in that area. He

also worked many times within a 25-foot radius from the bottom of the chute. It was even louder there than up in the balcony. On an average, he spent less than an hour's time there doing a repair.

Claimant further testified that he also repaired equipment in the reclaim grinders, salvage grinders and the snag grinders areas. While he would be repairing one of the reclaim grinders, another would be grinding approximately three feet away. A repair might take three days to a week to complete. In doing repairs in that area, he was within five or six feet of the grinder. A repair job in that area was usually less than a day because the machine was not used as much. In the snag grinder area, he worked within five or six feet of an operating grinder. A repair in that area usually lasted more than a day because machines had to almost be rebuilt, taking at least $2\frac{1}{2}$ to 3 days to complete.

Claimant also testified that he also did repairs near the cooling shaker in the heat treat department. Castings would be brought from nearby ovens and dumped into the two cooling shakers, which would shake down the castings until they were on one level. Once castings were dropped into the shakers, one could not have a conversation with someone standing a foot away. When the blowers were on, it was worse. At times, claimant had to work within two feet of a shaker while it was in operation. The work would often take more than one day. Sometimes he would spend months rebuilding an oven which was within five feet of the shaker. He also worked near the type-flask molding machines. The sound created was that of metal hitting metal and created a very loud jolting noise. Often claimant would have to "jolt" the machine himself to make sure it was operating properly. There was a three-foot area between machines. Often he would be repairing one machine while another one was in operation. Usually, a repair took only a few hours.

Claimant further testified that prior to 1975 he wore no ear protection. In 1975, the employer provided Swedish cotton which he would use in areas where there was a lot of noise. It was not mandatory to wear the Swedish cotton. Later, the company replaced the Swedish cotton with sponge-rubber plugs. Claimant could not recall the year in which this occurred. He did not recall anyone instructing him on how to use the sponge-rubber plugs, but there were instructions on the package they came in. Claimant could not recall what year the sponge-rubber plugs became mandatory, but he recalled using the sponge-rubber plugs in 1979 and 1980. He was disciplined once in 1982 for not wearing ear protection.

Claimant further testified that during 1977 he worked as a grinder inspector in the ductile foundry. The noise source was the same from the grinders in the ductile foundry as from the grinders in the malleable foundry. He worked around the grinders eight hours a day. He wore the Swedish-cotton ear protection.

Claimant further testified that from 1980 to 1985 he worked as a millwright out of the ductile maintenance shop located in the center of the ductile foundry. The shop was open at the top. The grinders were 200 feet away; however, close by were automatic molding machines, and in one corner of the maintenance shop were the sand mullers. The mullers were run by a 300-horsepower motor and never shut down so the noise was continuous. Claimant worked within 20 feet of the sand mullers approximately eight hours a day. According to claimant, you had to raise your voice above any sort of conversation level to be heard. Occasionally, he would leave the ductile maintenance area and work near a sprew table in the ductile foundry. Claimant explained that while the process is the same, the iron in the ductile foundry is tougher than in the malleable foundry and, as a result, it takes more strikes with the hammer to break the iron but produces the same type of noise. However, because the malleable foundry was a confined area, the noise was louder there.

Claimant further testified that when he first was assigned to the ductile maintenance shop, he was not required to wear ear protection in the shop itself. By 1983, ear protection was required in all areas of the plant. Prior to 1983, claimant wore ear protection if he was in a loud-noise area, including the maintenance shop. On occasion while he was doing repairs, he would have to remove the ear protection in order to listen to the machine, and other machines might be operating at the same time. At most he would have the earplugs out for 10 to 15 minutes.

Claimant further testified that prior to 1980, he had not experienced any problems with his hearing. During the 1980's, he began having difficulty distinguishing words and numbers. He also noticed ringing sounds in both ears. Until 1985, his hearing problems seemed to get worse. Since 1985, there has been no change in his hearing.

On cross-examination, claimant testified that, while he was assigned to the malleable maintenance shop, most of his work assignments took him outside of the shop. He would wear ear protection when available, but he did not recall ear protection being available as early as 1970. While he was assigned to the ductile maintenance shop, he spent most of his time outside of the shop, except for the last year. According to claimant, the earplugs did not lessen the intensity of the

noise but softened it. The sponge earplugs were better than the Swedish cotton.

Claimant testified further that between October 1977 and August 1980 he worked the third shift in the malleable foundry, during which period the molding department was shut down although the heat treatment, melt department and core room still operated. When the castings were being shaken, it was not a continuous noise as the cycle lasted 10 minutes, but the fans continued to blow. Once Swedish cotton was available, he wore it when the shakers were operating and in other noisy areas. However, Swedish cotton was not always available; sometimes the plant ran out of it.

On redirect examination, claimant testified that the Swedish cotton did not do much good at all. The sponge-rubber plugs had a little better effect at actually reducing the amount of noise. There were three 10-minute cycles per hour on the shaker machines. There were four to six large fans which were never shut off and which made a sound similar to that of a small jet engine. Claimant could not recall when he began using the sponge-rubber earplugs.

On re-cross-examination, claimant testified that after he was disciplined for not wearing ear protection, he wore ear protection all the time.

The parties stipulated that if called to testify, Lee Bond, the employer's safety director since 1982, would testify that he made noise level studies in 1983, 1985 and 1986 in both the malleable and ductile foundries and that for any area not included on the list (which was admitted into evidence), such as the maintenance areas in both the malleable and ductile foundries, the decibel level was 85 or less. He would further testify that Swedish-cotton ear protection was made available in 1970 and that the rule of thumb in the industry is that Swedish cotton has a noise-reduction level of 20 to 23 decibels.

The parties also stipulated that, if called to testify, Velma Madison, the employer's director of first aid since 1982, would testify that since 1982 earplugs have been mandatory and that the sponge earplugs have been made available to the employees since 1982. She would testify that she instructs the employees how to use them and that the employees are given annual audiograms. She would also testify that since 1982, she has been giving audiograms in soundproof booths with quieters and would vouch for their reliability. Finally, she would testify that the manufacturer's noise-reduction level is 35 decibels for the sponge earplugs.

The parties further stipulated that, if called to testify, Herschel Upton and William Burgess, two millwright maintenance men who

had worked for the employer for a significant period of time, would testify that they were not told how to wear the earplugs.

Dr. Steven Mark Sobol, an otolaryngologist (medical and surgical treatment of the head and neck including the ears, nose and throat), testified that he first examined claimant on September 10, 1986. Claimant told him he felt he had experienced a hearing loss and that it was possibly related to industrial noise exposure. The physical examination revealed no sign of any external auditory or middle nerve problem or any evidence of infectious disease. An audiologic study of claimant's hearing was conducted on the same day. An audiogram is a study done which tests the ability of an individual to hear pure tones at various frequencies in increments of 500 hertz. The hearing levels are recorded in decibels, the traditional unit that a hearing level is measured in, and a graph is then made. In addition, a speech study consisting of two types is conducted: one using words that require no discrimination of speech, only the simple ability to correlate with pure tones, and the other, an ability to perform a task in which speech discrimination is measured as a percentage of the number of words offered that are pronounced correctly by the individual being tested.

.Dr. Sobol testified further that claimant's audiometric study showed that he had a typical high, down-sloping, high-pitched or high-frequency sensorineural hearing loss which was unequivocally a problem in the inner ear itself or in the nerve of hearing or both. Based upon the speech discrimination study, it was somewhere in the inner ear rather than the nerve. Since this pattern is most frequently seen in a noise-induced situation and since claimant informed him that he had worked in a foundry for several years, Dr. Sobol recommended that claimant obtain his previous audiometric studies to determine if the loss of hearing was a progressive one or was based on past events.

Dr. Sobol testified further that he again saw claimant on May 18, 1988. Another audiometric study was performed. While there was some variation at certain frequencies from the test in 1986, Dr. Sobol explained that patients perform within 5 to 15 decibels on any given date, in any given frequency. Comparing the two studies, claimant was identical at the 250-hertz level with a slight improvement at the 500-hertz level. At the 8,000-hertz level, in 1986 it was 55 decibels for the right ear and 70 for the left ear, while in 1988 it was 70 decibels for the right ear and 80 decibels for the left ear. Dr. Sobol noted that some of the differences might be due to the testing artifact and that the 8,000 level was the most unreliable for being able to repeat the results consistently. Claimant had also improved in the speech discrim-

ination portion of the test. Otherwise, the test results between the two years were the same.

Dr. Sobol was then asked a hypothetical question in which he was asked to assume the following information: that the man in question had the same personal history and physical characteristics as the claimant; that he used firearms seasonally and had no known hearing problems; that he worked for the employer for approximately 20 years during which time he was exposed to industrial noise in excess of the levels and time required for noise exposure under the Workers' Occupational Diseases Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 172.36 *et seq.*); that since leaving the employer, he has not been exposed to those continual levels of noise but has continued to use firearms to hunt on a seasonal basis; and that between 1964 and 1971 he used no ear protection, between 1971 and 1981, he occasionally used a cotton-type earplug and from 1981 until he left the employer occasionally used a sponge-type earplug. Dr. Sobol was also asked to consider the results of the audiograms performed by the employer between 1971 and 1984, as well as the results of his own examination and testing of the claimant.

Based upon the audiograms taken both by the employer and his own office, Dr. Sobol opined that the pattern of hearing loss was most consistent with an acoustic trauma or a noise-induced type hearing loss as the primary causative factor in claimant's case. Other possible causative factors included an age-related hearing loss known as presbycusis, which is almost always a down-sloping sensorineural, more high-frequency base hearing loss. The onset of presbycusis is triggered by a combination of hereditary and limitedly environmental factors, which are quite unpredictable. If, in fact, claimant's hearing loss was a presbycusis-caused one, there should have been a further drop in his hearing between the audiometric studies done in 1986 and 1988. That the audiogram done in 1988 showed no significant loss and that the claimant had not had any significant noise exposure other than from the occasional hunting that he did supported the likelihood that the factors that were contributing to his pattern of hearing loss had been eliminated. Claimant did not have the yearly progressive loss based upon presbycusis being an aging process. According to Dr. Sobol, claimant's condition was a permanent one.

On cross-examination, Dr. Sobol testified that based upon his review of claimant's audiograms performed for the employer between 1971 and 1984, claimant had a substantial sensorineural hearing loss in the early 1970's and that his hearing loss was only slightly worse in 1986. On an average, in the 1,000, 2,000 and 3,000 frequencies, one

might expect to have a loss of one to two decibels per year after a certain age in a person with presbycusis. While he agreed that some of the deterioration could be attributed to the aging process, he also stated that between the ages of 42 and 55 you might not lose any hearing because of presbycusis. In claimant's case, while it was difficult to determine how much of his hearing loss could be attributed unequivocally to noise trauma versus aging and/or hereditary/aging process, Dr. Sobol stated that there was enough evidence to say that there was an acoustic-trauma phenomenon present.

Dr. Sobol testified further that as measured by the audiogram performed in 1986 claimant's average hearing loss based upon the 1,000, 2,000 and 3,000 frequencies showed a 46⅔-decibel hearing loss in the left ear and a 40-decibel loss in the right ear. Based upon the audiogram performed in 1988, claimant showed a loss of between three and four decibels in each ear between 1986 and 1988. Dr. Sobol agreed that for those frequences, between the period from the early 1970's to 1986, claimant's hearing loss was approximately a two-decibel loss per year. While he agreed that the type of slope seen on claimant's audiograms performed in 1986 and 1988 was consistent with a presbycusis-type hearing loss, as well as a noise-induced hearing loss, it was not a typical presbycusis loss as there would not be the flattening in the lower frequencies in classic presbycusis as was seen in claimant's case. According to Dr. Sobol, whether an initial noise-induced hearing loss made a person more susceptible to further deterioration because of presbycusis has never been documented.

On redirect examination, Dr. Sobol testified that the differing results from the audiograms, particularly those done in 1986 and 1988, could be attributed to the testing variables. Often the difference is as much as between 5 and 10 decibels. He would not vouch for the accuracy of the audiograms performed at the employer because of the number of different people who performed them, and they were done at different times of the day and in an environment that was not controlled. According to Dr. Sobol, as a person gets older, he tends to lose hearing slightly more rapidly.

Also admitted into evidence was Dr. Sobol's report of October 15, 1987. Based upon the audiometric studies on claimant done for the employer, Dr. Sobol noted that from 1972 through 1976, claimant's three-frequency-average hearing loss was approximately 30 decibels; from 1977 to 1982, the average was between 40 and 55 decibels; and between 1982 and 1984 between 55 and 60 decibels. He also noted that claimant's high-frequency range deteriorated slightly from 1972 through 1984. Dr. Sobol concluded as follows:

"Based upon [claimant's] history of occupational noise exposure in a range that would certainly qualify sufficient to cause noise[-]induced hearing loss, it is reasonable to assume that some of his high frequency hearing loss has been nurtured along by the continued noise exposure. Whether it was a direct cause of the hearing loss that we see is yet another matter and is certainly difficult to say. Certainly he had a high frequency hearing loss as far back as 1972 and, in fact, according to our measurements in the office, that loss is only slightly worse now that [sic] it was back then. He has aged some 15 years during that period of time and this in and of itself could account for some deterioration in the hearing."

Dr. Sobol concluded that claimant's condition was caused by a combination of presbycusis and occupationally related noise-induced hearing loss. However, it would be impossible to separate out the magnitude that each cause contributed.

A study done by Occupational Safety and Health Administration (OSHA) in 1976 was admitted into evidence. The study showed that the cooling shaker in the malleable foundry produced noise levels between 115 and 120 decibels while the castings were being cooled. When the castings were dumped from the shaker into the hoppers, the noise levels were between 110 and 112 decibels. The machine produced 95 decibels of noise when it was running without cooling castings. Also admitted into evidence were studies in 1983 and 1985 done by the employer which showed noise in the sprew table area of the ductile foundry to be at 103.6 (west machine) and 104.9 (east machine) decibels. The noise in the disamatic area on those two occasions registered at 98.5 and 98.9 decibels. The noise level in the snag grinder area measured 103.3 decibels in 1983 and 1985.

The arbitrator denied benefits, finding that claimant had failed to prove that he was exposed to noise levels as set forth in the Act. The arbitrator also found that the last day of exposure was September 27, 1982, and that since claimant's application for claim was not filed until May 23, 1986, more than three years after the date of last exposure, his claim was barred by the statute of limitations (Ill. Rev. Stat. 1991, ch. 48, par. 172.36(f)). The Commission reversed the arbitrator, finding that claimant was exposed to noise levels over 90 decibels for extended periods between 1975 and 1985. Based upon the findings and opinion of Dr. Sobol, the Commission further found that a causal relationship existed between claimant's hearing loss and his exposure to noise at work. The Commission also found that claimant's last day of exposure was his last day of work, namely, September 10, 1985,

and that therefore his claim was timely filed. Based upon a comparison of the audiograms taken by the employer in 1974 and 1984 and allowing the employer a credit of 1.66 decibels for pre-1975 hearing loss to the claimant's right ear, the Commission determined that claimant had sustained a hearing loss of 57.6% in the left ear and 36.4% in the right ear.

On review, the circuit court set aside the decision of the Commission as against the manifest weight of the evidence. The court specifically found that the record failed to show a causal connection between claimant's hearing loss and his exposure to noise at the workplace, since the record showed that claimant wore hearing-loss protection continually from the date of disciplinary action against him on September 24, 1982, more than three years before the filing of the claim for benefits. This appeal followed.

■■ At the outset, we reject the employer's request that we apply an "extra degree of scrutiny" to the decision of the Commission in this case because the Commission reversed the decision of the arbitrator without taking any new evidence. Recently, in *Komatsu Dresser Co. v. Industrial Comm'n* (1992), 235 Ill. App. 3d 779, 788-89, 601 N.E.2d 1339, 1345-46, this court confirmed that it had repudiated the statement found in both *Cook v. Industrial Comm'n* (1988), 176 Ill. App. 3d 545, 531 N.E.2d 379, and *Orkin Exterminating Co. v. Industrial Comm'n* (1988), 172 Ill. App. 3d 753, 526 N.E.2d 861, that a court of review is required to give "extra scrutiny" to a Commission's decision overturning an arbitrator's decision without considering additional evidence. (See *Dillon v. Industrial Comm'n* (1990), 195 Ill. App. 3d 599, 552 N.E.2d 1082.) Regardless of whether the Commission hears testimony in addition to that heard by the arbitrator, it exercises original jurisdiction and is in no way bound by the arbitrator's findings. *Dillon*, 195 Ill. App. 3d at 607, 552 N.E.2d at 1087.

It is well settled that it is a function of the Commission to determine whether there is a causal connection between a claimant's injuries and his employment. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1984), 124 Ill. App. 3d 650, 653, 464 N.E.2d 1097, 1099.) In making this determination, it is *solely* within the province of the Commission to judge the credibility of the witnesses, draw reasonable inferences from the testimony and determine the weight the evidence is to be given. (*Caterpillar*, 124 Ill. App. 3d at 653, 464 N.E.2d at 1099.) The fact that this court or the circuit court might have drawn other inferences from the evidence is not relevant, since a reviewing court will not disregard or reject permissible inferences drawn by the Commission nor will it substitute its own judgment for that of the

Commission unless its findings are against the manifest weight of the evidence. (*Caterpillar*, 124 Ill. App. 3d at 653, 464 N.E.2d at 1099.) The manifest weight of the evidence is that which is the clearly evident, plain and indisputable weight of the evidence, and in order for a finding to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276, 1281.

Section 7(f) of the Act provides in pertinent part as follows:

"(f) No claim for loss of hearing due to industrial noise shall be brought against an employer or allowed unless the employee has been exposed for a period of time sufficient to cause permanent impairment to noise levels in excess of the following:

| Sound Level DBA Slow Response | Hours Per Day |
|---|---|
| 90 | 8 |
| 92 | 6 |
| 95 | 4 |
| 97 | 3 |
| 100 | 2 |
| 102 | $1^{1}/_{2}$ |
| 105 | 1 |
| 110 | $1/_2$ |
| 115 | $1/_4$." |

(Ill. Rev. Stat. 1985, ch. 48, par. 172.42(f).)

The Act further provides that the employer is not liable for any hearing loss on or prior to July 1, 1975. Ill. Rev. Stat. 1985, ch. 48, par. 172.42(d).

In the record before us, the employer has conceded that, during his employment tenure, claimant was exposed to sound levels in excess of the statutory limits of section 7(f) of the Act. However, the employer maintains that the use of ear protection such as the Swedish cotton and the sponge earplugs by the claimant since 1975 brought the sound levels to below the 90-decibel threshold necessary for proving exposure under the statute. The employer points out that for most of his employment claimant was headquartered in the maintenance departments of both the malleable and the ductile foundries where the decibel levels were 85; that claimant offered no evidence of how often or how long he worked by a given machine; that claimant wore ear protection every time he worked in a noisy area of the plant; and that

following disciplinary action taken against him in 1982, he always wore ear protection.

■■ The record before us supports the conclusion that claimant was exposed to noise levels in excess of the statutory limits. In addition to the employer's concession that the noise levels in the plant exceeded the statutory levels, claimant testified as to the areas he worked in, the types of machines he was called upon to repair, as well as an estimate of how long repairs usually took, and he was able to describe the kinds of noise levels he was exposed to in the various areas. While the noise level in the maintenance areas was measured at 85 decibels, except for the last year of his employment, most of his assignments took him outside the maintenance departments.

We must now address the issue of the effectiveness of the hearing protection provided by the employer. The employer points to the stipulation by the parties that if called to testify Lee Bond would testify that Swedish-cotton ear protection had been made available to the employees since 1970 and that it had a noise-reduction level of 20 to 23 decibels, and Velma Madison would testify that since 1982 sponge earplugs have been mandatory in all areas of the plant and that the manufacturer's noise-reduction estimate is 35 decibels for sponge earplugs. On the other hand, the claimant points to the OSHA instruction manual, which was admitted into evidence and which analyzed how to evaluate various items of hearing protection. The formula used by OSHA required that manufacturer's rating be reduced by seven and the result be divided by two. The OSHA report also pointed out that laboratory results as to the level of effectiveness of ear protection was seldom achieved in the workplace.

According to claimant, between 1975 and 1979, he used Swedish cotton when it was available and when he was working in the noisy areas of the malleable foundry. Using the OSHA formula, the Swedish cotton reduced the noise level by only 7.25 decibels. The employer concedes that the noise levels in the malleable foundry ranged from 90 to 104 outside the maintenance area. Although the sound levels were higher in the molding room (up to 115 decibels), for the most part that area was shut down while claimant was working in that area.

Between 1979 and 1985, claimant used sponge-rubber earplugs. Using the same formula, the sponge-rubber plugs reduced the noise levels by 14 decibels. Although in 1980 he began working in the ductile foundry, he was again exposed to the noise from the grinders and the sprew chutes. The employer's noise studies done in 1983 and 1985 showed noise levels of 103.6 (west machine) and 104.9 (east machine)

decibels. The noise level in the snag grinder area (malleable foundry) measured 103.3 decibels in 1983 and 1986. Although the noise level in the grinder area of the ductile foundry measured only 94.1 decibels in 1983 and 1985, claimant testified that the sound level was the same in the grinder areas of both foundries.

In addition to the above, claimant testified that he often had to remove whatever ear protection he was wearing in order to listen to the machines he was repairing. Whether he continued this practice after disciplinary action was taken against him in 1982 is unclear from his testimony. In any event, claimant also testified that the use of ear protection "softened" the sound but not the intensity. Further, testimony from Velma Madison that the employees were instructed on the proper use of ear protection was contradicted by the testimony of claimant and two other employees.

In *United States Steel Corp. v. Industrial Comm'n* (1985), 132 Ill. App. 3d 101, 106, 477 N.E.2d 237, 240, this court held that it was proper to infer that an employer would not have given an employee ear protection if it did not serve the purpose indicated, that is, to eliminate excessive noise and that because the employee began to use it on a specific date the Commission properly found that date to be the date of last exposure. In *John Deere Plow & Planter Works of Deere & Co. v. Industrial Comm'n* (1988), 168 Ill. App. 3d 1096, 523 N.E.2d 386, the employer, relying on *United States Steel Corp.*, argued that an employee could not be exposed to excessive noise once he began wearing ear protection. This court explained that the date when ear protection is furnished cannot always be reconciled with the possibility that the furnished ear protection may be inadequate. *John Deere Plow & Planter Works of Deere & Co.*, 168 Ill. App. 3d at 1100, 523 N.E.2d at 388.

■ Given the decibel levels in the various areas that claimant worked and the OSHA formula applied to those decibel levels, together with claimant's testimony that the ear-protection devices furnished softened the sound but not the intensity of the noise, and that, at least up to 1982, he often removed the ear protection even in noisy areas of the plant to listen to the machines, there is some evidence in the record from which the inference that the ear protection furnished by the employer was inadequate could be drawn. We therefore conclude that, even in light of the evidence of the use of ear protection, the Commission's determination that claimant was exposed to sound levels in excess of those allowed by the statute was not against the manifest weight of the evidence.

■■ We also find that there was sufficient support in the record for the Commission's finding that there was a causal connection between claimant's hearing loss and his exposure to excessive noise at work. The employer argues that according to Dr. Sobol, claimant's age could in and of itself account for claimant's high-frequency hearing loss; that claimant's average decibel hearing loss at the three frequency levels was about two decibels per year; and that claimant had had a one- to two-decibel hearing loss in each year at the three frequency levels which would be consistent with an age-related hearing loss. In fact what Dr. Sobol did conclude was that claimant's hearing loss was a *combination* of presbycusis and occupationally related noise-induced hearing loss. Moreover, according to Dr. Sobol's report, as well as his deposition testimony, claimant's hearing loss got progressively worse until he left his employment, following which claimant experienced no significant hearing loss. A claimant need not prove his employment was the sole causative factor, only that it was a causative factor in the resulting injury. (*Johns-Manville Corp. v. Industrial Comm'n* (1975), 60 Ill. 2d 221, 226, 326 N.E.2d 389, 391.) The employer's argument that there was sufficient evidence to support the findings of the arbitrator and the circuit court misses the point. It is the Commission's decision which must be focused on, and so long as that decision is not against the manifest weight of the evidence, it is that decision that will be upheld regardless of whether a contrary decision by the arbitrator also finds support in the record.

■■ Dr. Sobol's testimony and report also support the Commission's finding that claimant's last day of exposure was September 10, 1985, his last day of work, rather than September 27, 1982, the date claimant began to consistently wear ear protection. As noted above, claimant's hearing deteriorated between 1972 and 1984, worse between 1982 and 1984. Thus, even during the period of continuous use of the ear protection, claimant's hearing loss was continuing. In his deposition testimony, Dr. Sobol explained that if claimant's hearing loss was a typical presbycusis loss, there would not be the flattening in the lower frequencies shown by the graph of claimant's hearing loss. There was conflicting testimony as to whether the employees were instructed on the proper use of the ear protection. Claimant testified that the sponge-rubber plugs worked better than the Swedish cotton in that they softened the noise to a certain extent. He still could not hear any conversation with or without the plugs while he was working around the machines. As we pointed out in *John Deere Plow & Planter Works of Deere & Co.*, it is the province of the Commission to infer whether the presence of ear protection had an effect

upon the employee's subsequent loss of hearing. (*John Deere Plow & Planter Works of Deere & Co.*, 168 Ill. App. 3d at 1100, 523 N.E.2d at 388.) We cannot say that the Commission's conclusion that the claimant's last day of exposure was September 10, 1985, was against the manifest weight of the evidence.

Finally, the employer contends that the Commission's determination of permanent partial disability was erroneous in that the Commission failed to follow the statutory requirements for determining such disability. Section 7(c) of the Act provides as follows:

> "In measuring hearing impairment, the lowest measured losses in each of the 3 frequencies shall be added together and divided by 3 to determine the average decibel loss. For every decibel of loss exceeding 30 decibels an allowance of 1.82% shall be made up to the maximum of 100 percent which is reached at 85 decibels." (Ill. Rev. Stat. 1985, ch. 48, par. 172.42(c).)

The employer argues that the Commission should have used the average of Dr. Sobol's 1986 audiometric findings of a loss of 46.66 in the left ear and 40 decibels in the right ear, rather than those of the employer's 1984 findings of a loss of 61.66 decibels in the left ear and 51.66 in the right ear, because Dr. Sobol's 1986 findings were the "lowest measured losses."

■ Our research has revealed no cases that address this specific question. We note, however, that the employer does not argue that the Commission should have used Dr. Sobol's 1988 findings because Dr. Sobol attributed the loss of hearing between 1986 and 1988 to the aging process. In calculating the amount of permanence, the Commission used a comparison of the claimant's audiograms taken by the employer in 1974 and 1984 and applied the statutory formula. Allowing the employer a credit of 1.66 decibels for claimant's pre-1975 hearing loss, the Commission found that claimant had sustained a 57.6% hearing loss in the left ear and 36.4% in the right ear. According to the employer, if Dr. Sobol's findings had been used, the percentage of permanent loss in claimant's left ear would be 30.32% and in the right ear 18.2%.

The statute does not provide a time frame for the resolving of which of the tests should be included in order to determine which is the lowest measured loss of hearing. Both the employer's tests, as well as those of Dr. Sobol, were admitted into evidence and were before the Commission. At first the differing results—given the short period of time between them—are somewhat disconcerting, considering Dr. Sobol's testimony that once claimant left his employment, he

suffered no significant hearing loss. However, Dr. Sobol also stated that he would not vouch for the accuracy of the employer's tests because of the lack of control over the testing variables in those tests, but that he would vouch for the accuracy of the tests conducted in his office. Given the plain language of the statute, we agree with the employer that the Commission erred in using the employer's findings as to claimant's hearing loss rather than those of Dr. Sobol in 1986.

Based upon all of the foregoing, we conclude that the record in this cause supports the Commission's decision that the claim for benefits in this cause was not barred by the statute of limitations; that claimant was exposed to noise levels in excess of the statutory levels and that there was a causal connection between claimant's employment and his hearing loss. Therefore, the Commission's decision on these issues was not against the manifest weight of the evidence. We further conclude, however, that the Commission did err in failing to use Dr. Sobol's 1986 findings in determining the award to claimant for partial disability.

The judgment of the circuit court is reversed, and the decision of the Commission is reinstated except for the award for permanent partial disability. Said award is reversed, and the cause is remanded to the Commission to recalculate said award in accordance with Dr. Sobel's 1986 findings.

Judgment reversed; Commission's decision is reinstated in part; Commission's award of permanent partial disability reversed; and the cause is remanded to Commission with directions.

McCULLOUGH, P.J., and RAKOWSKI, STOUDER, and RARICK, JJ., concur.